92 F.3d 31
 Shirley WATSON, Plaintiff-Appellee-Cross-Appellant,
v.
The CITY OF NEW YORK, Defendant-Appellant-Cross-Appellee,
Peter Holtz, individually and as a Police Officer, City of
New York, Defendant-Cross-Appellee,
Allyn R. Sielaff, individually and as Commissioner of the
Department of Correction of the City of New York, Defendant.
 Nos. 979, 1325, Dockets 95-7573(L), 95-7613(XAP).
 United States Court of Appeals,
Second Circuit.
 Argued March 20, 1996.
Decided Aug. 5, 1996.
 
 Deborah R. Douglas, Assistant Corporation Counsel of the City of New York, New York City (Paul A. Crotty, Corporation Counsel, Kristin H. Helmers, Assistant Corporation Counsel, New York City, of counsel), for Defendant-Appellant-Cross-Appellee.
 Carolyn A. Kubitschek, New York City (Lansner & Kubitschek, New York City, of counsel), for Plaintiff-Appellee-Cross-Appellant.
 Robert M. Baum, Attorney-in-Charge, Criminal Defense Division, The Legal Aid Society, New York City (Michele Maxian, Anthony Elitcher, The Legal Aid Society, New York City, of counsel), for Amicus Curiae The Legal Aid Society.
 Before LUMBARD and MAHONEY, Circuit Judges, and OWEN,* District Judge.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendant-appellant-cross-appellee the City of New York (the "City") appeals from the denial by the United States District Court for the Southern District of New York, John F. Keenan, Judge, of the City's motions for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure that were made both before and after a jury verdict that awarded plaintiff-appellee-cross-appellant Shirley Watson ("Watson") $20,000 on her claim that the City unduly delayed her arraignment in violation of New York law. Watson cross-appeals from the district court's dismissal, at the conclusion of the plaintiff's case, of her claim that the undue delay in her arraignment violated her rights under the United States Constitution. These determinations are reflected in a judgment entered June 1, 1995 in that court from which the appeal and cross-appeal are taken.
 
 
 2
 We reverse on the appeal and affirm on the cross-appeal.
 
 Background
 
 3
 On the evening of September 9, 1991, Watson learned from a neighbor that Watson's son, Marty Watson, had been shot. At approximately 8:00 p.m., Watson, accompanied by her daughter Marcia, arrived at Metropolitan Hospital ("Metropolitan") at 96th Street and First Avenue in Manhattan, where her daughters Regina and Francine were already present and Marty was undergoing treatment. Watson attempted to get information about Marty's condition.
 
 
 4
 Captain Brian Milzoff, the Emergency Medical Services ("EMS") duty captain for Bronx County, testified that between 9:00 p.m. and 10:00 p.m. that evening a group of people who had gathered outside Metropolitan accused a paramedic of taking a gold chain from the neck of a patient who had been admitted to Metropolitan earlier in the evening. Milzoff testified that he suggested that the group file a formal grievance, but the group became unruly "and a big melee broke out."
 
 
 5
 Milzoff decided that he needed assistance in handling the situation, and contacted the New York City Police Department (the "NYPD"). Several officers quickly arrived and ended the altercation. They authorized the hospital police to take into custody a man, later identified as Watson's son, Hezekiah or Peter Watson, who had allegedly assaulted an EMS lieutenant during the fight. Initially, the hospital police released Peter Watson after issuing him a summons for disorderly conduct. After Milzoff's supervisors told him that this was an unacceptable response to the assault, Milzoff again contacted the NYPD and requested that they arrest Peter Watson.
 
 
 6
 Shortly thereafter, defendant-cross-appellee NYPD Lieutenant Peter Holtz came to Metropolitan in order to assess whether Peter Watson should be arrested, and if so, to effect the arrest. Holtz interviewed several witnesses, and learned that Peter Watson was still present at Metropolitan. Accompanied by two other NYPD officers, Felipe Rodriguez and Julio Moreno, Holtz then located and arrested Peter Watson.
 
 
 7
 At trial, the parties offered conflicting testimony about the subsequent events. Watson testified that she calmly approached the officers who were placing Peter Watson in handcuffs, and repeatedly asked Holtz where her son was being taken. She claimed that Holtz eventually replied, "All you black people are just alike. I'm tired of you asking me the same question." Then, according to Watson, Holtz punched Watson in the chest, knocking her to the ground. She testified that the other two officers pulled Holtz back and told him not to strike Watson. The officers then handcuffed and arrested Watson, intentionally tightening the handcuffs after she requested that they be loosened. She was successively brought to the Twenty-third Precinct, where she was briefly interrogated, fingerprinted, and photographed, to Central Booking at One Police Plaza, where she was again fingerprinted and photographed, and to the courthouse at 100 Centre Street, where she was held in a cell with a number of other people awaiting arraignment.
 
 
 8
 According to Holtz (whose testimony was generally corroborated by Rodriguez and Moreno), Peter Watson was with a group of six or seven people, including his mother, when he was arrested. Watson persistently inquired why her son was being arrested, and then became loud and boisterous after Holtz explained that the arrest resulted from Peter Watson's assault upon an EMS officer and that Peter Watson would be taken to the Twenty-third Precinct.
 
 
 9
 After receiving an affirmative identification of Peter Watson from the assaulted EMS lieutenant, Holtz testified that the officers brought Peter Watson outside to their patrol car at the south side of Metropolitan, followed by Watson and the group of people accompanying her. Throughout the period when Holtz was escorting Peter Watson to the police car, Watson was continually tugging on Holtz's arm.
 
 
 10
 Holtz claimed that Peter Watson resisted being placed in the patrol car, and the officers attempted to pull down his shoulders in order to put him into the back seat. Holtz alleged that while he was attempting to get Peter Watson into the car, Watson jumped on his back and grabbed his neck. Startled by this attack, Holtz turned and pushed Watson, who fell backwards to the ground in a sitting position. The officers then arrested Watson, and charged her with assault, resisting arrest, and obstructing governmental administration. Holtz denied either having punched Watson or having used racial epithets.
 
 
 11
 It is undisputed that Watson remained incarcerated until her arraignment, which occurred at 12:00 p.m. on September 11, 1991, approximately thirty-six hours after her arrest. On October 15, 1992, all charges against Watson were dismissed on speedy trial grounds pursuant to section 30.30 of the New York Criminal Procedure Law.
 
 
 12
 On December 7, 1992, Watson initiated the present action against the City, Holtz individually and in his official capacity, and Allyn R. Sielaff, the Commissioner of the Department of Correction of the City, individually and in his official capacity. Count one of Watson's complaint charged Holtz with violating Watson's constitutional rights by using racially motivated excessive force in effecting her arrest, and the City with "deliberate indifference to police brutality[,] ... especially [regarding] African-Americans." Count two charged the City with failing its obligation adequately to train its police officers. Count three charged that Holtz falsely imprisoned Watson by arresting her without probable cause on account of her race, and charged the City with knowledge of racism within the police department and a failure to take adequate steps to address this situation. Count three also charged Sielaff and the City with a "fail[ure] to provide individuals with hearings within a reasonable time after the arrests of those individuals,"[1] acting under color of state law in violation of federal law. Count four alleged that the excessive force used by Holtz violated Watson's rights under New York State law. Count five charged Holtz with false arrest, and the City and Sielaff with wrongfully imprisoning Watson, in violation of New York State law. Finally, Count six charged Holtz with malicious prosecution of Watson.
 
 
 13
 Trial commenced on March 13, 1995. At the conclusion of the plaintiff's case, Watson agreed to dismiss count one as to the City, leaving Holtz as the sole defendant on that count. Watson also agreed to dismiss count two in its entirety, and count three as to Sielaff. The district court dismissed the federal constitutional claim against the City with respect to count three, but ruled that the "state claim" under that count, see infra note 5, survived. The district court dismissed count five as to the City and Sielaff on the ground that it was duplicative of count three, and also dismissed count six.
 
 
 14
 In denying the City's motion to dismiss the "state claim" under count three, see infra note 5, the district court stated that People ex rel. Maxian ex rel. Roundtree v. Brown, 77 N.Y.2d 422, 568 N.Y.S.2d 575, 570 N.E.2d 223 (1991) (per curiam), "say[s] that there is an obligation [on the part of the City] to give an explanation when the delay [in arraignment] is more than 24 hours." The City argued that Roundtree, which was a habeas corpus case interpreting section 140.20(1) of the New York Criminal Procedure Law,[2] was inapplicable because it did not create a private right of action for money damages in a civil case.[3] Nevertheless, the district court ruled that the issue could go to the jury.
 
 
 15
 At the conclusion of trial, the district court submitted special interrogatories to the jury on the remaining counts. The basic interrogatories regarding liability inquired whether Holtz had (1) used excessive force against Watson in violation of her constitutional rights, (2) committed an assault and battery on Watson in violation of state law, or (3) unlawfully arrested Watson in violation of (a) her constitutional rights, or (b) state law; and whether the City had unnecessarily delayed Watson's arraignment.
 
 
 16
 In the course of its deliberations, the jury submitted a note that inquired (as to the interrogatory directed to the City's liability) whether "the verb 'delayed' impl[ied] 'intentional.' " The district court responded as follows:
 
 
 17
 I'm going to answer your question this way. The section of the law involved [i.e., section 140.20(1) of the New York Criminal Procedure Law, supra note 2] reads, "Upon arresting a person, a police officer after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties required in the particular case must, without unnecessary delay bring the arrested person or cause her to be brought before a local criminal court." The section does not use the word "intentional" or "purposeful."
 
 
 18
 "Delay" means, and I looked this up in Black's Law Dictionary, "delay" means "to retard, to put off, to postpone, to defer, to procrastinate, to prolong the time of, to hinder or to interpose obstacles."
 
 
 19
 The jury thereafter answered all the interrogatories regarding Holtz's liability in his favor, but determined that the City had unnecessarily delayed Watson's arraignment and awarded her $20,000 in resulting damages. The district court denied the City's renewed motion for judgment as a matter of law, and judgment was entered in accordance with the jury's verdict.
 
 
 20
 This appeal and cross-appeal followed.
 
 Discussion
 
 21
 The City contends on appeal that Watson was allowed to recover on a private right of action implied from section 140.20(1) of the New York Criminal Procedure Law, as interpreted by the New York Court of Appeals in Roundtree, which held that any delay in arraignment of more than twenty-four hours is presumptively "unnecessary" within the meaning of section 140.20(1), supra note 2. See Roundtree, 77 N.Y.2d at 426-27, 568 N.Y.S.2d at 577, 570 N.E.2d 223. The City urges us either to reverse the district court's implicit finding of a private right of action under section 140.20(1) or to certify the question to the New York Court of Appeals pursuant to section 0.27 of the Rules of the United States Court of Appeals for the Second Circuit,[4] and section 500.17 of the Rules of the New York Court of Appeals.[5]
 
 
 22
 Watson, on the other hand, claims that this count went to the jury on a theory of common law false imprisonment,[6] in accordance with the New York rule that "[a]n arrest, lawful in its inception, may nevertheless be rendered void ab initio for purposes of a false imprisonment action if there is an unnecessary delay in arraignment." Lewis v. Counts, 81 A.D.2d 857, , 438 N.Y.S.2d 863, 864 (2d Dep't 1981) (mem.) (citing Ross v. Village of Wappingers Falls, 62 A.D.2d 892, 406 N.Y.S.2d 506 (2d Dep't 1978) (per curiam), and Bass v. State, 196 Misc. 177, 92 N.Y.S.2d 42 (Ct.Cl.1949)). On her cross-appeal, Watson "challenges only the dismissal of her federal claim for damages for delay in arraignment."
 
 
 23
 We accordingly proceed to address Watson's state law and federal law claims for delay in arraignment.
 
 
 24
 A. The State Law Claim for Delay in Arraignment.
 
 
 25
 We agree with the City that the district court presented the delay in arraignment issue to the jury as a private right of action implied from section 140.20(1). As previously noted, the discussion (at the conclusion of the plaintiff's case) concerning the City's motion for a directed verdict on Watson's delay of arraignment claim was directed almost exclusively to the requirements imposed by Roundtree.[7] In addition, and most critically, the district court responded to the jury's inquiry regarding the issue of intentional delay by quoting extensively from section 140.20(1), the statute construed in Roundtree, and pointing out that the statute does not include a requirement of intentional action. Finally, the district court's jury instruction was clearly premised upon the twenty-four hour standard established in Roundtree, as was Watson's closing argument.
 
 
 26
 Judge Keenan's response to the jury's question concerning the element of intent is significant not only because of its clear focus upon section 140.20(1), but also because by rejecting a requirement of intentional delay it directly undermines Watson's claim that the case was tried on a theory of common law false imprisonment. It is settled that false imprisonment is an intentional tort under New York law. See Lombardoni v. Boccaccio, 160 A.D.2d 1089, 1091, 553 N.Y.S.2d 249, 250 (3d Dep't 1990); Wheeler v. State, 104 A.D.2d 496, 498, 479 N.Y.S.2d 244, 246 (2d Dep't 1984) (mem.). We conclude that the case was tried on the basis of an implied statutory, rather than common law, right of recovery.
 
 
 27
 We turn, then, to the question whether section 140.20(1) gives rise to a private right of action. We see no need to certify this question to the New York Court of Appeals, as suggested by the City. Generally, we
 
 
 28
 certif[y] questions to the New York Court of Appeals only where there is a split of authority on the issue, where the statute's plain language does not indicate the answer, or when presented with a complex question of New York common law for which no New York authority can be found.
 
 
 29
 Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 51 (2d Cir.1992), certified question withdrawn as moot, 984 F.2d 69 (2d Cir.1993) (per curiam). In the present case, there is no split of authority on the existence of the private right of action at issue, the issue is not unduly complex, and as will appear, the question of statutory interpretation posed by this case is not sufficiently difficult to warrant certification. We turn to the merits.
 
 
 30
 To begin with, we are mindful that "[i]n the absence of any guidance from state courts, federal courts are hesitant to imply private rights of action from state criminal statutes." In re Integrated Resources, Inc. Real Estate Ltd. Partnerships Sec. Litig. (Kinley Corp. v. Integrated Resources Equity Corp.), 851 F.Supp. 556, 564 (S.D.N.Y.1994). In deciding whether a statute creates a private right of action, New York considers the factors laid out by the Supreme Court in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). See CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 280, 519 N.Y.S.2d 804, 809, 514 N.E.2d 116 (1987); Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 325, 464 N.Y.S.2d 712, 716, 451 N.E.2d 459 (1983). The Cort factors include the following:
 
 
 31
 First, is the plaintiff one of the class for whose especial benefit the statute was enacted ...? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?
 
 
 32
 422 U.S. at 78, 95 S.Ct. at 2088 (internal quotation marks and citations omitted).[8]
 
 
 33
 While the first of the Cort factors is presumably satisfied in the present case, Watson offers no support for either of the other factors. Most importantly we are given no indication that the New York legislature intended to create a new private right of action in enacting section 140.20(1). This possibility is seriously undermined by the fact that the determination whether to infer a private statutory right of action is made "in light ... of existing common-law ... remedies, with which legislative familiarity is presumed." Burns, 59 N.Y.2d at 325, 464 N.Y.S.2d at 716, 451 N.E.2d 459. In this case, a statutory right of action would be largely superfluous because, as noted above, the common law tort of false imprisonment includes a right to recover for undue delay in arraignment. A separate statutory right of action would serve no purpose beyond broadening liability to cover nonintentional violations. The legislature was presumptively aware of this fact, and we are afforded no indication that it chose to create a new right of action simply to weaken the mens rea requirement for liability at common law.
 
 
 34
 We conclude that the district court erred in allowing the jury to award Watson damages pursuant to a private right of action implied from section 140.20(1).
 
 
 35
 B. The Federal Law Claim for Delay in Arraignment.
 
 
 36
 Watson challenges the district court's dismissal of the claim in count three of her complaint, see supra note 5, that the delay in her arraignment violated her rights under the United States Constitution. Watson's appeal brief acknowledges that the Supreme Court "set[ ] 48 hours as the presumptive outside limit for confinement prior to arraignment" in County of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991). Watson contends, however, that by enacting section 140.20(1), "the state of New York created a liberty interest in people being released, or at least arraigned, within 24 hours." Watson relies upon Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), which holds that "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." Id. at 472, 103 S.Ct. at 871.
 
 
 37
 Section 140.20(1) concededly uses "explicitly mandatory language," although not "repeated[ly]," in specifying that an arresting officer "must" bring an arrestee to arraignment "without unnecessary delay." See supra note 2. The analysis in Hewitt upon which Watson relies, however, was repudiated by the Supreme Court in Sandin v. Conner, --- U.S. ----, ---- - ----, 115 S.Ct. 2293, 2298-2300, 132 L.Ed.2d 418 (1995), which concluded that the Hewitt methodology for identifying due process interests created by state law was "in practice ... difficult to administer and ... produce[d] anomalous results." Id. at ---- n. 5, 115 S.Ct. at 2300 n. 5.
 
 
 38
 Furthermore, the analysis upon which Watson premises her argument is fundamentally flawed, wholly aside from its reliance upon Hewitt. Ample precedent establishes that a state rule of criminal procedure, such as section 140.20(1), does not create a liberty interest that is entitled to protection under the federal Constitution. As the Supreme Court has stated, "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." Olim v. Wakinekona, 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983); see also Doyle v. Oklahoma Bar Ass'n, 998 F.2d 1559, 1570 (10th Cir.1993) ("The mere expectation of receiving a state afforded process does not itself create an independent liberty interest protected by the Due Process Clause."); Pugliese v. Nelson, 617 F.2d 916, 924 (2d Cir.1980) (" 'Although a Due Process Clause liberty interest may be grounded in state law that places substantive limits on the authority of state officials, no comparable entitlement can derive from a statute that merely establishes procedural protections.' " (quoting Cofone v. Manson, 594 F.2d 934, 938 (2d Cir.1979))). As the Seventh Circuit has explained:
 
 
 39
 Constitutionalizing every state procedural right would stand any due process analysis on its head. Instead of identifying the substantive interest at stake and then ascertaining what process is due to the individual before he can be deprived of that interest, the process is viewed as a substantive end in itself.... A basic problem, in terms of cogent federal constitutional analysis, with maintaining that one has an entitlement to a state created procedural device such as a hearing is that the dimensions of the procedural protections which attach to state law entitlements are defined by federal standards.... If a right to a hearing is a liberty interest, and if due process accords the right to a hearing, then one has interpreted the Fourteenth Amendment to mean that the state may not deprive a person of a hearing without providing him with a hearing. Reductio ad absurdum.
 
 
 40
 Shango v. Jurich, 681 F.2d 1091, 1101 (7th Cir.1982).
 
 
 41
 Watson contravenes these precedents by framing her alleged "liberty interest" in terms of the specific arraignment requirements mandated by section 140.20(1) as interpreted in Roundtree. Arraignment, however, is a procedure that protects the true liberty interest at stake in this case--freedom from confinement. This is made clear by the definition of the issue presented for decision on this appeal by the Supreme Court in County of Riverside, as follows:
 
 
 42
 In Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), this Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest. This case requires us to define what is "prompt" under Gerstein.
 
 
 43
 500 U.S. at 47, 111 S.Ct. at 1665. Similarly, in Gerstein, the Court pointed out that "[b]oth the standards and procedures for arrest and detention have been derived from the Fourth Amendment and its common-law antecedents." 420 U.S. at 111, 95 S.Ct. at 861 (collecting cases).
 
 
 44
 Thus, the federal, constitutional liberty interest at stake in this case derives directly from the Fourth Amendment, as well as from the due process guarantees of the Fifth and Fourteenth Amendments. See Ingraham v. Wright, 430 U.S. 651, 672-74, 97 S.Ct. 1401, 1413-14, 51 L.Ed.2d 711 (1977). Of course, liberty interests may be created by state law, see Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), in which event they are entitled to the procedural protections accorded by the Fourteenth Amendment, see id. Federal law, of course, prescribes the nature and extent of the procedural protections afforded by the federal Constitution.
 
 
 45
 It follows that whether an arraignment is adequately "prompt" to satisfy the Fourth Amendment, as construed by Gerstein and County of Riverside, is a federal issue that is not affected by the New York Court of Appeals' construction of the phrase "without unnecessary delay" in section 140.20(1). Because Watson's sole claim under the federal constitution is erroneously premised upon the proposition that Roundtree 's construction of section 140.20(1) creates a liberty interest that is protected by the Fourteenth Amendment, that claim is unavailing.Conclusion
 
 
 46
 The judgment of the district court awarding damages in the amount of $20,000 to Watson is reversed. The district court's dismissal of Watson's federal claim for delay in arraignment is affirmed.
 
 
 
 *
 The Honorable Richard Owen of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 While Watson's complaint alleges only that unspecified "individuals" were held for an undue time without arraignment, we construe this as alleging a deprivation on the part of Watson herself. See Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). By contrast, count five of the complaint specifically alleges that Watson was unlawfully imprisoned
 
 
 [2]
 Section 140.20(1) provides in pertinent part:
 Upon arresting a person without a warrant, a police officer, after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties required in the particular case, must except as otherwise provided in this section, without unnecessary delay bring the arrested person or cause him to be brought before a local criminal court and file therewith an appropriate accusatory instrument charging him with the offense or offenses in question.
 
 
 [3]
 We observe that habeas corpus provides an available remedy in arraignment situations, and in New York is available to obtain the immediate release of an arrestee who has been in custody more than twenty-four hours without an acceptable explanation. See Roundtree, 77 N.Y.2d at 426-27, 568 N.Y.S.2d at 576-77, 570 N.E.2d 223
 
 
 [4]
 Section 0.27 provides in pertinent part: "Where authorized by state law, this Court may certify to the highest court of a state an unsettled and significant question of state law that will control the outcome of a case pending before this Court."
 
 
 [5]
 Section 500.17 provides in pertinent part:
 (a) Whenever it appears to ... any United States Court of Appeals ... that determinative questions of New York law are involved in a cause pending before it for which there is no controlling precedent of the Court of Appeals, such court may certify the dispositive questions of law to the [New York] Court of Appeals.
 
 
 [6]
 Watson pled a claim for false imprisonment in count 5 of her complaint, but the district court dismissed count five as duplicative of the "state claim" pled in count three of Watson's complaint. We have some doubt that count three alleged a state claim at all. That count virtually tracked the language of 42 U.S.C. § 1983 by alleging that the City had, "acting under color of state law, ... deprived plaintiff of her right to liberty and due process of law, in violation of the Fifth and Fourteenth Amendments to the United States Constitution." Cf. § 1983 ("Every person who, under color of [state law], subjects ... any [person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."). In any event, there is no dispute that Watson's complaint somewhere alleged a state law claim for delay in arraignment, and the question presented on appeal is not precisely where and how that claim was pled, but how it was tried and presented to the jury. Cf. Fed.R.Civ.P. 15(b) (regarding amendment of pleadings to conform to the evidence presented at trial)
 
 
 [7]
 Watson points to a comment by Judge Keenan during this colloquy that Watson was "not relying on a statute." This comment, however, occurred in the course of a discussion regarding the aggravation of damages that would result from a delay in arraignment after an initially illegal arrest, and does not pertain to the issue presented on this appeal, i.e., liability for excessive delay following a legal arrest
 
 
 [8]
 Cort also lists as an additional factor whether "the cause of action [is] one traditionally relegated to state law, in an area basically the concern of the States." Id. This factor is obviously not applicable to the determination of an implied private right of action from a state statute, as opposed to the federal statute at issue in Cort