[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This petition for habeas corpus challenges fourteen Disciplinary Reports which resulted in the Petitioner's loss of good time. Since the petition involves the length of the Petitioner's confinement, it is properly before this Court.
A habeas hearing was held before this Court on July 19, 2001 and August 8, 2001 with the Petitioner present and represented by counsel, Attorney Milo Altschuler.
In open court the Petitioner withdrew his challenge of the July 25, 1996 Disciplinary Report, Petitioner's Exhibit 15, because he had pleaded guilty in regard to that incident.
Following the August 8, 2001 hearing the parties submitted briefs[1]
after receiving transcripts of the two days of hearings which the Court has reviewed as well as the transcripts.
 LEGAL STANDARD
CT Page 16844
It is well-settled law that an ". . . inmate has no constitutional right to confrontation and cross-examination in prison disciplinary proceedings, such procedures in the current environment, where prison disruption remains a serious concern, being discretionary with the prison officials." Wolff v. McDonnell, 418 U.S. 539 (1974). Further, in Baxterv. Palmigiano, 425 U.S. 308 (1976) the court held that a state prison inmate has no general due process right to confront and cross examine adverse witnesses at disciplinary proceedings against him, there being no constitutional requirement that prison authorities must provide reasons in writing to inmates denied the privilege to cross-examine or confront witnesses.
As to the prison regulations; in this case the Code of Penal Discipline Directive No. 9.5, it is also well-settled law that violation of the procedures by the prison authorities of the Code of Penal Discipline does not implicate or violate due process rights of the inmate. The seminal case involving this issue is Sandin v. Connor, 515 U.S. 472, 481, 482
(1995). The Court stated: "By shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the Court (referring to Hewitt v. Helms,459 U.S. 460 (1983) which was overruled by Sandin v. Connor) encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges. . . . A prison regulation (is) primarily designed to guide correctional officials in the administration of a prison. Not only are such regulations not designed toconfer rights on inmates,. . . . (Emphasis added). In light of the above discussion, we believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and apply in Wolff and Meachum . . . We hold, therefore, that neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded Connor a protected liberty interest that would entitle him to the procedural protections set forth in Wolff." In the case at bar this Court finds that if the prison regulations do not entitle the Petitioner to the procedural protections set forth in Wolff, then they certainly do not protect a liberty interest that would violate the Due Process Clause. Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999), (the Second Circuit Court of Appeals includes the State of Connecticut) quoted Sandin, supra, stating that "Sandin held that such (liberty) interests are generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. . . . Although there is no bright-line rule regarding the length or type of sanction that would give rise to an `atypical and significant hardship', this standard will not be CT Page 16845 met unless the disciplinary and administrative sanctions are onerous." Citations omitted ". . . . 30 days' disciplinary segregation did not constitute atypical, significant hardship." In Colon v. Howard,215 F.3d 227, 231-32 (2d Cir. 2060) the Court commented that confinement for a period of less than 101 days would not constitute an atypical and significant hardship. Judge Newman commented that confinement in normal SHU (segregated housing unit) conditions of less than 180 days did not constitute atypical and significant hardship. Here, in the case at bar, Petitioner served only fifteen days punitive segregation and thirty days confined to quarters with ninety days loss of mail. This is clearly not atypical and significant hardship. Further, under Frazier v. Coughlin,81 F.3d 313, 317 (2d Cir. 1996) and Cofone v. Manson, 594 F.2d 934, 938
(2d Cir. 1979), the court found that state procedures do not create constitutional due process rights. As pointed out in Cofone, "No comparable entitlement (to due process) can derive from a statute that merely establishes procedural requirements." If a statute that establishes procedural requirements does not implicate a due process right, then certainly a prison regulation does not implicate a due process right. In Watson v. City of New York, 92 F.3d 31 (2d Cir. 1996) the court stated: "The mere expectation of receiving a state afforded process does not itself create an independent liberty interest protected by the Due Process Clause. . . . Constitutionalizing every state procedural right would stand any due process analysis on its head." Id. 38.
 FINDINGS
The Respondent has claimed that the Petitioner's claims are barred by the principle of laches in that the Disciplinary Reports start in 1989 and go through 1996, and yet the action for habeas corpus was not brought until February 2000. Ordinarily the Court would agree with the Respondent. However, the Court does not find that the Respondent has been prejudiced in this case because of the delay with exceptions that are hereafter noted.[2] Prejudice is a necessary element to find laches against the Petitioner.
As for the Respondent's claim that the principle of res judicata bars this habeas petition, it is true that normal principles of res judicata apply to habeas corpus petitions. McCarthy v. Warden, 213 Conn. 289
(1989). Respondent cites a case before Judge Thomas Corrigan on a habeas involving the Petitioner and a case before Judge John Downey in New Haven on a civil rights claim under Section 1983 claiming money damages for infliction of emotional distress. Although only the Disciplinary Report of April 1, 1996 was raised before Judge Downey, it is true that in the case before Judge Downey other Disciplinary Reports could have been raised. "Simply put, the doctrine of res judicata provides that when a CT Page 16846 final judgment has been entered on the merits of a case, it is a finality as to the claim or demand in controversy, concluding parties, and those in privity with them, not only as to every matter which was offered andreceived to sustain or defeat the claim or demand, but as to any otheradmissible matter which might have been offered for that purpose." Nevadav. United States, 463 U.S. 110, 130 (1982). (Emphasis added). However, in the case of Anaconda-Ericsson, Inc. v. Hessen, 762 F.2d 185, 190 (2d Cir. 1985) the Court of Appeals stated that res judicata operates to bar an action when the earlier decision was "(1) a final judgment on the merits; (2) by a Court of competent jurisdiction; (3) in a case involving the same parties or their privies; and (4) involving the same cause of action." This Court finds that the matter before Judge Corrigan concerned an issue of the failure of the Department of Corrections to promulgate regulations and that the claim before Judge Downey was for infliction of emotional distress. Therefore, these causes of action were not the same as in the case at bar which is an attempt to restore good time credits. Accordingly, res judicata does not apply.
It is also well-settled law that prison officials are accorded great deference in matters of prison Security. See Bell v. Wolfish, 441 U.S. 520,548 (1979). A correctional officer may give an inmate a Disciplinary Report when the officer believes that an inmate's behavior is violative of established institutional rules or is threatening the safety and security of the institution. Conduct such as possession of drug paraphernalia or being found intoxicated based upon documented laboratory urinalysis is the type of conduct that would threaten the security of the institution and is also violative of the Code of Penal Discipline. Under said Code of Penal Discipline, possession of drug paraphernalia and intoxication are both Class A offenses.
Further, the Court bases its decision in this matter on the exhibits and also to a large degree the credibility of the witnesses. The Petitioner is heartfelt in his desire to overturn these Disciplinary Reports, but the Court finds that the witnesses for the Respondent were more credible than the Petitioner. This is based upon their demeanor on the witness stand, their ability to remember certain facts or not remember same, the Petitioner in this case having a faulty memory on many facts which is not surprising since some of these tickets go back more than ten years, the consistency or inconsistency of the testimony of the witnesses as well as the consistency or inconsistency of their testimony as opposed to other evidence, including the exhibits, and the manner in which they responded to questions from counsel.
Keeping all of the above principles and factors in mind, the Court will now address each of the Disciplinary Reports as follows: CT Page 16847
1. Disciplinary Report of September 13, 1988, Petitioner's Exhibit 2.
Drug paraphernalia, a number of syringes, was found in Petitioner's cell following a shake down. It is true that there is no investigative report attached to Plaintiff's Exhibit 2. However, based upon the testimony of Lieutenant Jeffrey Emanuel which the Court found credible, the Hearing Officer must have the Investigative Report to proceed with the hearing. He will not proceed without it. He also testified that the Investigative Report is read at the hearing, the Advocate's Report is read at the hearing and the inmate is allowed to tell his side of the story. The Advocate for the inmate receives the Chain of Custody form as to any samples sent out to and returned by a laboratory. Captain Steven Frey, a Corrections Officer, testified that he had undergone multiple hours of training on collecting urine samples. Further, if there were errors or breaks in the chain of custody, he would not submit the reports as evidence. He also testified that there was no requirement that the Investigator's or Advocate's Reports be kept in the inmate's master file. The Court does find as to all of the Disciplinary Reports and Summaries that where reports are missing, the principle of laches does bar the Petitioner from successfully challenging those Disciplinary Reports on the ground of missing documents. Petitioner has claimed that he did not see the need to contest the Disciplinary Reports until November, 1998 when he first became aware that as a result of the loss of good time stemming from these Disciplinary Reports he would not be released in November, 1998. He did not bring this Petition until the year 2000. The Court is not impressed with his reason for delay and finds the delays inexcusable, not only from 1998 to 2000 but also that the reason for the delay as testified by the Petitioner is not a valid reason for delaying the initiation of the Petition concerning those Disciplinary Reports dating back to 1988 through 1996. On civil rights claims in Federal Court there is a three year statute of limitations, and based upon the last report being in 1996, four years in which to bring the Petition is an inexcusable delay. Common sense would tell an inmate that continual Disciplinary Reports resulting in loss of good time of which he was notified would mean that he would be penalized as to the length of his confinement. Common sense would dictate that November, 1998 was not the first time he became aware of the effect of the Disciplinary Reports and loss of good time. As for the claim that Investigative and Advocate's Reports and reports from laboratories and Chain of Custody reports are missing, this inexcusable delay by the Petitioner did prejudice the Respondent. Accordingly, as to those claims of documents being missing, the Petitioner is barred by the doctrine of laches.
2. Disciplinary Report of October 19, 1988, Petitioner's Exhibit 3.
Petitioner violated a direct order to return to Q-4 area. The report of CT Page 16848 the Investigator indicates that the Petitioner declined to comment on the above report.
3. Disciplinary Report of August 23, 1989, Petitioner's Exhibit 4.
The Petitioner was found guilty of intoxication based upon a urine specimen offered by the Petitioner showing the presence of morphine. He would not talk to either the Investigator or his Advocate.
4. Disciplinary Report of September 6, 1989, Petitioner's Exhibit 5.
During a routine shake down of Petitioner's cell one hypodermic needle with syringe was found which was a Class A offense. Petitioner refused to give a statement to the Investigator. There was no challenge as to the chain of custody, and based upon Captain Frey's testimony the Court finds no break in the chain of custody.
5. Disciplinary Report of October 20, 1989, Petitioner's Exhibit 6.
A Corrections Officer found a needle syringe in the Petitioner's shoe. Although the Petitioner denied any knowledge of it, he called no witnesses; he had Mr. Coleman and/or Perkins as an Advocate.
6. Disciplinary Report of November 3, 1989, Petitioner's Exhibit 7.
Petitioner refused to give a urine specimen in violation of a direct order. He stated that on November 3, 1989 he violated the direct order twice and stated to the Investigator he was not physically able to give a urine sample. The Investigator's report indicates that on the followingday, November 4, 1989, the Petitioner was again asked by the Investigator and Lieutenant Feliciano for a urine specimen and again stated he was unable to do so. The Court finds this inability on three separate times over two days hard to believe.
7. Disciplinary Report of July 12, 1990, Petitioner's Exhibit 8.
A hypodermic needle, a bottle cap that appeared to have something being cooked in it, and a piece of sheet that had been made into a tourniquet were found in Petitioner's cell. Petitioner's response to the Investigator was that he could not remember what happened. The Petitioner refused to attend the hearing although his Advocate, Morgan, was there.
8. Disciplinary Report of April 22, 1992, Petitioner's Exhibit 9.
Petitioner refused a direct order to give a urine specimen which is a Class A offense. He then did give a urine specimen to Lieutenant CT Page 16849 Scozzafara. A Corrections Officer testified that it tested positive in a drug/alcohol screen test.
9. Disciplinary Report of August 25, 1992, Petitioner's Exhibit 10.
Urine sample tested positive for opiates based upon an independent laboratory report.
10. Disciplinary Report of December 5, 1994, Petitioner's Exhibit 11.
Petitioner was found guilty of intoxication. A Metpath laboratory report of Petitioner's urine sample tested positive for opiates. Petitioner stated that the procedure of the urine test was not in accordance with Administrative Directive 6.8. However, Corrections Officer Little stated that he conducted the procedure in accordance with the directive. That was considered by the Hearing Officer, and said Hearing Officer believed the Corrections Officer as opposed to the Petitioner which evidentiary ruling this Court will not overturn.
11. Disciplinary Report of January 20, 1995, Petitioner's Exhibit 12.
Petitioner submitted a urine sample on January 15, 1995 which was sent to Metpath Laboratory on January 16, 1995. The report of January 20, 1995 tested positive for heroin. Petitioner disputed this claiming that there is no test which can verify the use of heroin and that the urine testing procedure was conducted incorrectly. This was rejected by the Hearing Officer. There is a test that can verify the use of heroin. The Hearing Officer found that the paperwork showed that the procedure was conducted properly. Petitioner wanted witnesses who conducted the procedure to testify so that he could prove the procedure was done incorrectly. However, as stated above, he has no right to confront and cross-examine witnesses against him.
12. Disciplinary Report of February 21, 1995, Petitioner's Exhibit 13.
Petitioner was tested on February 13, 1995, and the test kit showed that he tested positive for opiates. Petitioner denied the results and wanted the urine sent out for further examination by Metpath Laboratory. Metpath Laboratory results confirmed a positive finding for opiates. Petitioner appeared at the hearing with Ms. Staub as his Advocate to question the handling of his specimen and that he was being harassed. The Hearing Officer found that he was not being harassed in that this test was part of random urine testing. The Hearing Officer also found that the chain of custody and urinalysis record were properly handled.
13. Disciplinary Report of April 17, 1996, Petitioner's Exhibit 14. CT Page 16850
Petitioner produced a urine specimen which was tested with the Respondent's drug testing kit which tested positive for opiates. The sample was then sent to Corning Clinical Laboratories for confirmation. On April 17, 1996 Corning Laboratories Report found the urine specimen positive for opiates. Petitioner claimed that he should have been able to cross-examine on the issue of chain of custody which as stated above he was not entitled to do.
14. Disciplinary Report of July 10, 1996, Petitioner's Exhibit 15.
This was withdrawn by the Petitioner at the habeas hearings because he had pleaded guilty to this offense.
The Court finds further that the Petitioner either attended or could have attended all hearings at which the Investigator's Report was read aloud, the Advocate's Report was read aloud, and the Petitioner was allowed to tell his side of the story. Either he or his Advocate could view the evidence such as the laboratory report, the syringes and the Chain of Custody forms. Many of the challenges by the Petitioner were that he was not allowed to examine the evidence or question those who produced the evidence. Based upon the above he or his Advocate were allowed to view the evidence, and neither he nor his Advocate had a right to cross-examine and confront witnesses against him. In order to challenge the laboratory reports, the chain of custody, and the other evidence, he would have had to confront and cross-examine witnesses who produced the evidence, a right to which he was not entitled as indicated above. Petitioner also claimed that one of the reports did not have a number on it. The Court dismisses that claim as being irrelevant, minor and of no prejudice to the Petitioner.
The United States Supreme Court in Superintendent v. Hill, 472 U.S. 445,455 (1985) established the "some evidence" standard for a guilty finding in a prison disciplinary situation. This means that even if there is a minimum of evidence as long as there is some evidence of guilt, that is enough to justify a guilty finding. This Court finds that the evidence presented to the Hearing Officers and all of the above Disciplinary Reports were based upon either eye-witness testimony, physical evidence such as the syringes, or the laboratory reports showing the presence of drugs or alcohol. Therefore, the evidence meets the standard set forth inSuperintendent v. Hill, supra.
 CONCLUSION
For the reasons stated above, none of the Petitioner's due process rights were violated. Accordingly, the Petition is DISMISSED. CT Page 16851
Rittenband, JTR