Lenore DIETZ and William Dietz, in-
dividually and on behalf of James
Dietz, and infant, Plaintiffs,

v.

Harold DAMAS, et al., Defendants.

Civil Action No. CV–91–5016.

United States District Court,
E.D. New York.

Dec. 5, 1996.

Carolyn A. Kubitschek, David J. Lansner, Lansner & Kubitschek, New York City, for Plaintiffs Lenore Dietz and William Dietz.

Paul A. Crotty, Corporation Counsel of the City of New York (Lawrence Wolff and Diana M. Murray, of counsel), New York City, for Defendants Harold Damas, Daniel El-more, Marcia Lewis, William J. Grinker, Brooke Trent and City of New York.

Robert J. Poblete, Pellini & Poblete, New York City, for Defendant and Counter-Claimant Diane McGurn.

### MEMORANDUM AND ORDER

TRAGER, District Judge:

By memorandum and order dated July 11, 1996, reported at 932 F.Supp. 431 (E.D.N.Y. 1996), the motion for summary judgment made by the City of New York on behalf of itself and its individual employee defendants was granted. The remaining pendent state claims, including plaintiffs' claim against defendant Diane McGurn and Mrs. McGurn's counter-claims against the plaintiffs, were also dismissed.

Plaintiffs have timely moved under Fed. R.Civ.P. 59(e) to reargue and vacate the judgment. Their motion falls roughly into two categories. First, plaintiffs offer an extensive analysis of what they view as errors in the opinion. The common thread in this portion of plaintiffs' motion is that I improperly "decide[d] every factual issue against plaintiffs and [drew] every inference against plaintiffs," in violation of the well-established federal standards for summary judgment. Pls.' Mot. ¶ 8. The second portion of the motion takes issue with the policy concerns for the effective operations of a child protective system expressed in the decision. *See Dietz*, 932 F.Supp. at 433, 460. In connection with this portion of their argument, plaintiffs have submitted copies of 1991, 1995 and 1996 New York State Department of Social Services ("state DSS") reports concerned with child protective services in New York City. Plaintiffs passionately express their concern for the harm that may have befallen families and children as the result of actions of the Child Welfare Administration ("CWA") on unsubstantiated reports of child abuse.

In their reply papers on the motion for reargument, plaintiffs for the most part repeat arguments made in opposition to the motion for summary judgment. These include reiteration of their views that the defendants failed to comply with the New York Family Court Act hearing requirements;

that the defendants failed in their duty to investigate Mrs. McGurn; and that the defendants (and the opinion) placed undue reliance on the initial abuse report. However, plaintiffs also raise several issues not discussed in their initial brief in support of their motion for reargument.[1] These include an argument that even if Mrs. Dietz had caused James's injuries by shaking, CWA was required to and failed "to determine the likelihood that she would injure or endanger him again" before making a determination that an emergency existed. Pls.' Reply at 4. Finally, the reply brief advances several new legal arguments that take issue with the initial decision and its analysis.

The motion for reargument is granted; however, for the reasons stated below, the original decision granting summary judgment to the City defendants is adhered to. The following analysis presumes familiarity with the facts and legal reasoning found in the memorandum and order dated July 11, 1996.

### 1. Summary Judgment was Appropriate

The opinion relied greatly on *van Emrik v. Chemung County*, 911 F.2d 863 (2d Cir.1990), and, to a lesser extent, on the more recent *Defore v. Premore*, 86 F.3d 48 (2d Cir.1996). In both of these cases, the Second Circuit

held that summary judgment was proper under similar circumstances.[2] It is notable that in their briefing of the summary judgment issue on this reargument motion plaintiffs make no reference to recent Second Circuit decisions concerned with child abuse proceedings. Plaintiffs first refer to this body of law in their reply brief where they make an effort to distinguish the facts of those cases from the facts presented here. *See* Pls.' Reply Br. at 11–12. Instead, their initial brief for reargument relies on a heterogeneous array of cases concerned with summary judgment motions in such areas as antitrust, police misconduct and Title VII.[3]

However, application of summary judgment standards used in cases that were based on substantially different issues of law and fact still results in the grant of summary judgment to the City defendants because there is no genuine issue with regard to any material fact.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.

---

1. The City objected to plaintiffs' practice of raising entirely new issues in their reply; as a result, the City was permitted to file a sur-reply.

2. In *van Emrik*, the grant of summary judgment on the basis of the qualified immunity to the county caseworkers was affirmed with respect to all but one claim that is unlike any presented here. In *Defore*, 86 F.3d at 51, on plaintiffs' appeal from a directed verdict at the conclusion of their trial, the Second Circuit cautioned: "In this case, it would have been preferable for the District Judge to have ruled in the defendants' favor at an earlier stage of the proceedings, thereby avoiding altogether the trial that the defendants were obliged to endure."

Subsequent to the July 11th decision, I became aware of another recent Second Circuit decision, *Gottlieb v. County of Orange*, 84 F.3d 511 (2d Cir.1996). *Gottlieb* affirmed summary judgment for child protective workers on grounds of qualified immunity and for the agency on grounds that "the undisputed facts established that the County had adequately trained its caseworkers." *Id.* at 513. Despite having filed an amicus brief in support of the appellants in *Gottlieb*, plaintiffs'

attorneys made no reference to the decision in their initial brief for reargument. Plaintiffs first referenced it in their reply brief in connection with their argument that CWA had to establish "reason to fear imminent recurrence [of serious abuse]." Pls.' Reply Br. at 5.

3. *See, e.g., Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (antitrust); *LaFond v. General Physics Serv. Corp.*, 50 F.3d 165 (2d Cir.1995) (termination of whistle-blower employee); *Gallo v. Prudential Residential Serv., L.P.*, 22 F.3d 1219 (2d Cir.1994) (discharge and refusal to rehire in violation of ADEA); *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57 (2nd Cir.1993) (employee claim of slander against former employer); *Walker v. City of New York*, 974 F.2d 293 (2d Cir.1992), *cert. denied*, 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993) (police and prosecutorial misconduct); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119 (2d Cir.1991) (police misconduct); *Sorlucco v. New York City Police Dept.*, 888 F.2d 4 (2d Cir.1989) (discriminatory discharge); *United States v. One Tintoretto Painting*, 691 F.2d 603 (2d Cir.1982) (forfeiture proceeding).

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). A recent Second Circuit decision, *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996), stated: "On appeal 'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

The critical issues in this case are: first, whether CWA had an objectively reasonable belief that an emergency existed that warranted placing a hold on James in the hospital on December 22, 1988 and restricting his discharge to his grandparents on December 23, 1988; second, whether a delay in providing an adversarial hearing of six court days (during most of which period James was in the hospital), violated constitutional due process protections; third, whether the CWA investigation was constitutionally inadequate in failing to eliminate the Dietzes from suspicion prior to Dr. Giridharan's letter of March 1989 and Dr. McHugh's undated opinion that was issued after the Family Court hearing; fourth, whether the filing of the Family Court petition against the Dietzes was constitutionally malicious, that is, lacking probable cause; and finally, if probable cause existed, whether the petition was filed in retaliation for the exercise of First Amendment rights and succeeding in chilling the Dietzes' exercise of those rights. Disagreements about facts that do not bear on these issues are not issues of material facts, and "[a] dispute as to an immaterial fact does not preclude summary judgment." 10A *Charles A. Wright et al., Federal Practice and Procedure 2d* § 2725 (1983) (citing cases).

### a. No Disputes Concerning Genuine Issues of Material Facts

#### (1)

■ In this case there is no question that there is a dispute as to whether Dr. Giridharan, the treating neurologist, told Harold Damas, the case worker, on December 30, 1988 that the shaking occurred "a few" hours before the symptoms were manifested, as she testified at her deposition, or the "several" hours that Mr. Damas recorded in his notes. However, whichever formulation is accurate is of no moment because in the full context of Dr. Giridharan's deposition, she clearly and unequivocally testified that she refused to give Mr. Damas a time frame for the abuse and told him that "the investigation[ ] [is] up to him." Giridharan at 5, City Ex. F. Moreover, in her deposition, Dr. Giridharan confirmed that Mr. Damas had informed her of the importance of establishing a time frame for the abuse and that, even with that knowledge, she had refused to provide one. *See id.* at 28–29. Thus no *genuine issue* of fact exists as to Dr. Giridharan's refusal to narrow the time-frame in the relevant period, and this refusal is *the* material fact.

Significantly, both in their original brief and in their reply brief, plaintiffs raise no objection concerning the opinion's analysis of and conclusions as to these undisputed facts about Dr. Giridharan's statements to Detective ("Det.") Diggs and Mr. Damas, her letter in March 1989, and her deposition testimony.[4] Here, the opinion accepted the plaintiffs' view that Dr. Giridharan told Mr. Damas on December 30, 1988 that the shaking had to have occurred within a "few" hours of the manifestation of symptoms. Plaintiffs have not, however, challenged the finding that Dr. Giridharan's testimony establishes that, when she spoke to Mr. Damas on December 30, 1988, knowing the importance of the time frame to determining who the abus-

4. Again, only in their reply, plaintiffs acknowledge for the first time (possibly only for purposes of their argument), the qualitative difference between Dr. Giridharan's statements in December 1988 and in March 1989 regarding the timeframe of abuse. *See* Pls.' Reply Br. at 14. In any case, Dr. Giridharan's statements made after the Family Court hearing are irrelevant. Plaintiffs also argue that having received two inconsistent estimates from Dr. Giridharan, one on December 22 and the other on December 30, CWA should have immediately relied on her latest pronouncement, and without consulting the Family Court immediately "releas[ed] James." *Id.* Even if this were a correct statement of the law, it would not alter the fact that Dr. Giridharan was unwilling in either statement to pinpoint the time of the abuse.

er was, she refused to narrow the time frame to exonerate the Dietzes. Plaintiffs have also not challenged the finding that the police investigative reports submitted by the plaintiffs confirm that Dr. Giridharan had also told Det. Diggs on December 22, 1988, that "it had to of happened on that day Tuesday but she could not give a time." Pls.' Ex. A. Plaintiffs also do not challenge Dr. Giridharan's credentials as an expert in the field of WSIS or her expert knowledge of James's condition from her role as treating neurologist.[5]

This is the crux of the case. Contrary to plaintiffs' assertion, Pls.' Reply Br. at 3, who, in fact, was responsible for James's injuries is not the issue. Nor is this action a proceeding designed to provide the plaintiffs with a forum to seek public exoneration. The issue here is whether the City defendants' initial action in asserting custody of James was objectively reasonable. Plaintiffs' argument that the decision made several erroneous inferences is irrelevant to this issue; none of these allegedly erroneous inferences bear on material facts. The undisputed facts are that James was severely injured as the result of deliberate shaking; that Dr. Giridharan refused to limit the time frame in which the abuse might have occurred to eliminate Mr. and Mrs. Dietz from suspicion on December 22, 1988 to Det. Diggs; and that Dr. Giridharan again refused to narrow the time frame in a conversation with Mr. Damas on December 30, 1988. Once the defendants confirmed that Dr. Giridharan continued to hold the view that the child was the victim of abuse and that she could not give a time frame that eliminated the Dietzes as a possible source of the abuse, no issue of material fact remains. At this point in time, CWA continued to have an objectively reasonable belief that Mr. and Mrs. Dietz represented a danger to their severely injured son. In filing a petition in Family Court CWA could reasonably rely solely on Dr. Giridharan's refusal to narrow the time frame. The other information they obtained during this period served to reinforce CWA's reasonable belief that the Dietzes were responsible. This oth-

er information—positive reports concerning Mrs. McGurn, from her neighbors, from other parents for whom she babysat, and even from Mrs. Dietz (as reported by the hospital social worker)—did not give CWA or the police a reason to suspect Mrs. McGurn. The absence of evidence against Mrs. McGurn at this time, in turn, made it reasonable for both Det. Diggs and Mr. Damas to rely on Mrs. McGurn's statements.

Dr. Giridharan's position also led the police (whose investigation has been praised by the plaintiffs), to close the case on January 21, 1989, as "NON–AMENABLE there is no way to prove that any one person had Exclusive Opportunity." Pls.' Ex. A, emphasis in original. But in no way does this later action by the police undercut CWA's conclusion that an emergency situation existed and that they reasonably could believe that Mrs. Dietz was responsible. The police report clearly indicated that a crime had occurred but they could not definitively identify the culprit.

(2)

■ In their reply brief, plaintiffs argue for the first time that, even if CWA had reason to believe that Mrs. Dietz had blinded James by shaking him severely, it had to make the further prediction "that she would injure or endanger him again." Pls.' Reply Br. at 4. The only authority plaintiffs have cited for this asserted rule is *Gottlieb*, which does not stand for any such proposition. The significance of *Gottlieb* is the Second Circuit's statement of the rule that "[w]here ... there is an objectively reasonable basis for believing that parental custody constitutes a threat to the child's health or safety, government officials may remove a child from his or her parents' custody at least pending investigation." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996) (citations omitted). The initial decision here is completely consistent with the rule articulated in *Gottlieb*.

Plaintiffs' argument that caseworkers must make an additional determination is also directly refuted by *van Emrik v. Chemung*

5. Although plaintiffs assert that Dr. Giridharan was an "independent expert," Pls.' Reply Br. at 14, in fact, she became the infant plaintiff's treat-

ing physician with whom the parents were in repeated contact throughout the period from December 1988 to March 1989.

*County*, 911 F.2d 863 (2d Cir.1990), a case factually much closer to plaintiffs'.[6] In *van Emrik*, as here, a child was indisputably injured, but the caseworkers were unable to determine whether the parents or the baby-sitter caused the injury. There was no indication that the child would be injured again, or that the abuse was part of a pattern.[7] Nevertheless, caseworkers obtained an order from a Family Court judge allowing them to take the child to a foster home. The Second Circuit affirmed the district court's grant of qualified immunity to the caseworkers. The Second Circuit's opinion bears repeating:

> The issue is not whether it was absolutely essential to remove the child or whether a more sensitive course might have been to leave the child hospitalized pending further investigation. The issue is whether it was objectively reasonable for the defendants to make the decision they made, and no rational jury could find that it was not.

*van Emrik*, 911 F.2d at 866. *See also Chayo v. Kaladjian*, 844 F.Supp. 163, 169 (S.D.N.Y. 1994) ("To remove children, caseworkers need not 'believe' that child abuse is ongoing and that danger is imminent; caseworkers need only have been 'presented with evidence' of abuse and have 'reason to fear' that danger is imminent.") (quoting *Robison v. Via*, 821 F.2d 913, 922 (2d Cir.1987)). Plaintiffs' assertion that a caseworker must determine that an injured child is likely to suffer additional harm before removal is warranted is untenable.

**b. McGurn Statements Regarding James's Second Bottle**

 In their motion for reargument, plaintiffs place great emphasis on what they characterize as "Mrs. McGurn's *incriminating* statement," her "admission on December 22 [to Det. Diggs] that James had drunk seven ounces of milk," Pls.' Mot. ¶ 10,[8] and that the opinion improperly relied on the presumably less incriminating statement on December 27 to Mr. Damas, that she [McGurn] had attempted to feed James.[9] Plaintiffs are (apparently) suggesting that the contradiction in Mrs. McGurn's statements should have immediately indicated to the defendants that Mrs. McGurn, not the Dietzes, was the source of James's injury. Once defendants

---

6. Contrary to plaintiffs' assertion in their reply brief, at 11, the van Emriks did not initially consent to restriction of their custody of their child. "Upon [the van Emriks'] refusal [to agree to a temporary placement of the child with the Department], the order was served and the child was taken to a foster home." *van Emrik*, 911 F.2d at 865. Furthermore, plaintiff's contention that the parents in *van Emrik* were given notice before the state went to Family Court is also incorrect: "The county attorney tried unsuccessfully to reach the parents' lawyer. Without alerting the parents, who were at the hospital, the defendants and the county attorney then visited the Family Court Judge. . . ." *Id.* Plaintiffs also characterize the child's stay in the hospital in the custody of the state for twelve days as the product of a mutual agreement. The record states only that after placement in a foster home, the child was returned to the hospital at the urging of the family pediatrician. *See id.* There is no language in *van Emrik* that supports plaintiff's characterization of the facts.

7. Plaintiffs repeatedly contend that James may have been injured inadvertently. However, they have not offered any evidence to contradict Dr. Giridharan's statement that James was intentionally shaken. *See* 932 F.Supp. at 434.

8. Plaintiffs also state, without further explanation, that the opinion's discussion of this allega-

tion "relitigate[s], sua sponte, an issue that has already been decided!" Pls.' Mot. ¶ 10. The litigation of the issue of Mrs. McGurn's culpability in Kings County Supreme Court ended with the refusal of a grand jury to issue an indictment against her. The litigation of the issue in Family Court ended in the withdrawal of the petition against the Dietzes, with continued supervision for six months. The State Department of Social Services granted Mrs. Dietz's request for expungement of the child abuse report in 1992. Pls.' Ex. H. Neither Dr. McHugh, Det. Diggs nor Mrs. McGurn were ever questioned about the "hearsay statement" by Mrs. McGurn in Det. Diggs's report upon which Dr. McHugh based her time estimate. Moreover, neither of the state court dispositions create any estoppel on the issue of whether or not James took a second bottle of milk on December 16, 1988 immediately prior to manifesting symptoms of distress. There was never any opportunity for cross-examination of any of the individuals involved with respect to this issue. Plaintiffs appear to wish to accord a decision not to prosecute the effect of issue preclusion on non-parties. Still, for the purposes of this motion, it is assumed that Mrs. McGurn made the alleged "incriminatory" statement.

9. As the opinion noted, there are several possible explanations for the discrepancy in the statements Mrs. McGurn made to Det. Diggs and Mr. Damas. *See* 932 F.Supp. at 440 n. 10.

were aware of this contradiction, and that Mrs. McGurn had stated on December 22 that James had drunk seven ounces of milk, they should have realized that this statement excluded the Dietzes from suspicion, since James would not have been able to consume this milk if he had been injured by the Dietzes. *See* 932 F.Supp. at 435, 440. This argument is unpersuasive.

As the opinion notes, *see* 932 F.Supp. at 456, plaintiffs have provided absolutely no evidence—not even any conclusory allegations—to establish that Mr. Damas, other CWA staff, or Det. Diggs had any reason to know that this information might prove significant in determining the time that the abuse took place. Plaintiffs have pointed out that Mr. Damas had no special training in WSIS. *See* Pls.' Br. dated November 19, 1993 at 6. Furthermore, Dr. Giridharan's testimony contains no indication that she ever identified the issue either for her own diagnostic purposes or to assist Mr. Damas or Det. Diggs in their investigations.[10] In addition, with respect to the other expert consulted by CWA, Mr. Damas reported that the supervising Zone Director Fenton had stated, after his discussion with Dr. McHugh, that she had asked for "the estimation of blood in brain," without indicating that when and what the child had eaten might be an important factor in determining the time of the abuse. Damas case notes, City Ex. I. As with Dr. Giridharan's statements, there was no reason for the defendants to think from Dr. McHugh's statement that the alleged contradiction in Mrs. McGurn's statements was important. *See* 932 F.Supp. at 440. Nor have plaintiffs presented any evidence to indicate that the defendants should have recognized the significance of this "admission" or the contradiction. "The non-movant may defeat summary judgment only by producing specific facts showing that

there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir.1996). The conclusory allegation that the statement was an "admission" and was "incriminatory" is simply not sufficient to raise an issue of material fact, especially in view of the inability of the non-expert police officer and the case-worker to recognize the significance of the discrepancy in the two accounts. Even if this failure to perceive the contradiction could be viewed as some form of negligence, the defendants' failure would not undercut their qualified immunity defense.

**c. Objections to Other Items from Mr. Damas's Case Notes**

■ Plaintiffs argue that details from Mr. Damas's case notes were improperly included in the opinion. As an initial matter, it should be noted that none of these details formed the basis for the decision, but were provided as a useful backdrop to illustrate the uncertainties surrounding James's injury. In general, plaintiffs have confused the opinion's construction of a chronological narrative from the extensive materials provided by both sides with drawing inferences and conclusions regarding material facts.

Plaintiffs first criticize the reference in the decision (inaccurately characterizing it as acceptance) to "the hearsay statement of defendant Diane McGurn, reported by defendant Harold Damas, that Mrs. Dietz carried James like a football...." Pls.' Mot. ¶ 9. The statement's existence is obviously relevant, at least to the extent that it bears on the objective reasonableness of CWA's actions. Because it was not relied upon to determine whether CWA had probable cause for its actions, its veracity is not an issue of material fact. Nor was it treated as such in the decision.[11] Similarly, the reference to the

---

**10.** Curiously, plaintiffs castigate the untrained caseworker, Mr. Damas, first for failing to recognize the significance of the inconsistency that is found in his and Diggs' interview reports regarding Mrs. McGurn's statements and second, for failing to bring the inconsistency to the attention of the expert, Dr. Giridharan. Pls.' Br. dated November 19, 1993 at 14. In view of her expertise, Dr. Giridharan's failure to alert either investigator that when and how much milk James had

consumed might be critical to their investigation seems a far more significant lapse.

**11.** Plaintiffs' argument appears to assume that, as hearsay referenced for its truth, it would be inadmissible at trial, whereas, in fact, it may well be admissible as part of a business record. In their reply brief, plaintiffs for the first time suggest that the meaning of the statement lay in Mrs. McGurn's effort to claim "the injury was unin-

elevator that later was found to be malfunctioning is likewise without significance with respect to the critical issues of the case.

Likewise, the "football" statement has no relevance to the issue of a delay in providing a hearing or whether the Family Court petition constituted malicious prosecution. Plaintiffs themselves introduced the statement in connection with their argument that CWA's investigation was constitutionally inadequate. Plaintiffs questioned Mr. Damas about the "football" remark during his deposition, *see* Damas I, City Ex. H at 99, and cited it in their Brief dated November 19, 1993 at 24, as an illustration of the alleged inadequacies of the investigation. Thus, the statement might be relevant to the question of whether the investigation conducted by CWA was constitutionally inadequate in failing to eliminate the Dietzes from suspicion prior to Dr. Giridharan's letter. As noted, plaintiffs now suggest that the statement may indicate a non-intentional cause of James's injuries.[12] *See* Pls.' Reply Br. at 4. In any case, a description of the context in which the "football" statement was recorded was intended to assist in understanding plaintiffs' allegations and defendants' responses. *See* 932 F.Supp. at 435.

Again confusing narrative with inference, plaintiffs criticize the opinion's treatment of the dismissal of the McGurn indictment, *see* 932 F.Supp. at 441, stating: "The Court also tries to draw every inference against Mrs. Dietz regarding the grand jury testimony." Pls.' Mot. ¶ 15. In fact, the passage quotes and summarizes Justice Feldman's decision that dismissed the McGurn indictment and includes Mrs. Dietz's attorney's explanation of her grand jury testimony. A narrative detailing the criminal prosecution of Mrs. McGurn and its disposition was necessary, at a minimum, to an understanding of Mrs. McGurn's position as a defendant and counter-claimant in the case.[13]

Plaintiffs also argue that the opinion mischaracterized the statement Dr. Grillo made to Mr. Damas. Specifically, plaintiffs note that the opinion stated that "[Mr.] Damas's notation that Dr. Grillo would not guess at who had injured James," without including Dr. Grillo's statement that he had " 'utmost confidence in [grandparents] and [in] the parents that child will be . . . taken care of.' " Pls.' Mot. ¶ 11. The opinion did quote both statements, but omitted that Dr. Grillo expressed confidence in the parents as well as the grandparents. The position of these statements in relation to each other in Mr. Damas's notes indicate that there is no relationship between Dr. Grillo's statement about the ability of the parents and grandparents to care for James and his refusal to guess at the person who caused the injury. The statement about the parents is made in the middle of a discussion about the child's immediate care, while the refusal to make a guess as to who caused the injury comes in response to a later, direct question. *See* City Ex. I.

Assuming, however, that the expression of confidence in the parents should allow an

---

tentional." Pls.' Reply Br. at 4. Assuming the correctness of that interpretation, counsel does not explain how this would render the defendants' conduct objectively unreasonable, in light of the statutory presumption that WSIS is presumed to be prima facie evidence of abuse. *See* 932 F.Supp. at 447. Moreover, it is inconsistent for plaintiffs to place such great reliance on the factual accuracy of Mrs. McGurn's "admission" regarding the second bottle of milk fed to James while otherwise arguing that Mrs. McGurn's statements in other respects are "hearsay" that should not have been credited by CWA personnel.

**12.** Although, in their reply brief, plaintiffs characterize the CWA investigation as one in which "the government goes out and searches for more evidence so that it can win the hearing when the hearing ultimately takes place," at 11, in fact,

CWA's efforts included questions apparently intended to elicit the possibility that the injury was caused accidentally or in a time frame that would have eliminated the Dietzes. Further, the custody arrangement, with the Salmos providing the sole supervision for Mr. and Mrs. Dietz's contact with their son, does not support the view that CWA took a highly adversarial approach to the matter.

**13.** Plaintiffs point out, with respect to Mrs. Dietz's praise for Mrs. McGurn as a babysitter, that such praise is not inconsistent with Mrs. McGurn having committed the abuse. *See* Pls.' Mot. ¶ 14. While obviously true, the issue for decision is the reasonability of CWA's conduct at the time of its actions. Mrs. Dietz's expression of confidence in the babysitter would certainly justifiably impact on CWA's evaluation of the situation at the time.

inference to be drawn that Dr. Grillo was impliedly doubting that the parents were the source of the abuse, this inference is not material. First, his flat refusal to exclude the Dietzes as the source of the abuse significantly undercuts the weight given to any such inference. Second, given the severity of the injury and Dr. Grillo's inability to determine the culprit, his "confidence" in the grandparents and parents on the basis of his limited contact with them in the hospital could scarcely end the matter for CWA, and Mr. Damas noted he had said as much to Dr. Grillo. *See* City Ex. I. Nor could a reasonable jury find otherwise.

Plaintiffs also object to the reference to another item from Mr. Damas's notes, that "while Mr. Dietz was speaking to Mr. Damas, Mrs. Dietz went to the kitchen for a few seconds and ran her fingers through her hair." [14] 932 F.Supp. at 437. They suggest that the statement can support only the inference that she was suffering, not that she was guilty. *See* Pls.' Mot. ¶ 12. In fact, however, Mr. Damas's notation was cited for the possibility that Mr. Dietz was still under consideration as a suspect at the time. *See* 932 F.Supp. at 445. Accepting the plaintiffs' interpretation for purposes of the motion, it may be noted that whether Mr. Dietz was involved is not a genuine issue of material fact. Mr. Damas testified that CWA considers families as units, not person by person. Damas I at 144–45, City Ex. H. Treating an intact couple as a family unit for custody purposes is supported by *Tenenbaum v. Williams*, 862 F.Supp. 962, 978 (E.D.N.Y. 1994), cited in *Dietz*, 932 F.Supp. at 445, nn. 15–16.

Plaintiffs further allege that the "Court accepted defendant [Mr.] Damas's notations of what Brookdale Hospital personnel said on

James's second admission" and "relied solely on [Mr.] Damas's notes in deciding that the Dietz family did not notify [Mr.] Damas or anyone else in CWA that James had been readmitted." Pls.' Mot. ¶ 14. In fact, there is no notation in Mrs. Dietz's otherwise quite complete notes indicating any notice to CWA by the Salmos or the Dietzes of James's rehospitalization. *See* City Ex. AA, attached to Murray Reply Aff. dated August 2, 1995. Further, plaintiffs do not now assert that either the Dietzes or the Salmos notified CWA of James's readmission to the hospital. Non-movants must produce specific facts to avoid summary judgment. *See Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir.1996). In any event, even if the Dietzes did notify CWA of James's readmission, giving CWA notice would not overcome the fact of Dr. Giridharan's refusal to eliminate them from suspicion at the time in question.

**d. Narrative Not Solely an Assemblage of "Material" Facts**

Because of plaintiffs' claim that the City investigation was constitutionally deficient, the opinion attempts to construct a detailed account of the investigation conducted by CWA. Here, Mr. Damas's case notes were generally used for the fact of their existence rather than for the truth of the statements they contained. [15] They provide evidence of the body of information obtained, as well as background for the decisions made at the time. The notes were prepared contemporaneously with the events they chronicle and provide a more detailed and relevant record than do the depositions conducted several years after the events in question. In any event, it is the decisions, not the notes, that must be objectively reasonable. Much of the material from the case notes used in the

---

14. Plaintiffs also object that this "fact" "was not listed as a material fact in defendants' [3(g)] statement." Pls.' Mot. ¶ 12. In the first place, it is not a material fact. In the second place, the defendants' 3(g) statement was filed in 1992 and has not been updated since that date, although additional discovery and further proceedings have taken place.

15. In plaintiffs' two depositions of Mr. Damas, they reviewed his case notes extensively. Plaintiffs did not question their accuracy except as to

Mr. Damas's record of his discussion with Dr. Giridharan. Interestingly, plaintiffs assume the accuracy of the notes with regard to Mrs. McGurn's statement to him about the second bottle of milk. The notes might, on some issues, qualify for admission at trial under Fed.R.Evid. 803(6) as a regularly conducted activity, although a full analysis is clearly beyond the scope of this memorandum. The notes could certainly be used on direct and cross-examination of the persons whose statements are reported.

memorandum and order that has been cited as improper by the plaintiffs was presented, not because it stated a material fact needed in the analysis, but because it was needed to make the narrative comprehensible.

## 2. Child Abuse Protection Policy Considerations

Plaintiffs make two arguments regarding child abuse protection policies. In their reply brief plaintiffs suggest that the opinion stated that all reports of child abuse are entitled to great credence. This is a significant misstatement of the position set forth in 932 F.Supp. at 455: "Plaintiffs dismiss the presumption of reliability appropriately accorded to the original report of the abuse by a disinterested third party entitled to credence." This statement refers to the objective reasonableness of CWA's reliance in this case and not, as plaintiffs would have it, on an assertion of a presumption under New York law. Plaintiffs appear to make two arguments here: first, that probable cause determinations require a showing either greater than or akin to a preponderance; second, that inaccuracies in the state's reporting system require discounting filed abuse reports in this context. Each argument will be treated in order.

■■■ In its discussion of Dr. Giridharan's report, the opinion contrasted the deference due to· "disinterested third party" reporters such as Dr. Giridharan and the hospital social worker, persons who were legally obligated to report suspected abuse, with the requirements of independent proof applied to "reliable informants" in criminal proceedings. The latter standard, taken from criminal procedure concepts, along with others, had been proposed by the plaintiffs.[16] Pls.' Br. dated November 19, 1993 at 51. Here, as well as in their arguments discussing malicious prosecution and the error rate of New York State's Central Registry for child abuse, plaintiffs seem to suggest that probable cause should be understood to mean a pre-

ponderance of the evidence. Probable cause does not require finding that a preponderance of the evidence supported an action. Nor does it guarantee accuracy. It permits action based upon an objectively reasonable belief that an offense has been committed. As the Supreme Court has recently stated, reasonable suspicion and probable cause "are not 'finely tuned standards,' comparable to the standards of proof beyond a reasonable doubt or of proof by a preponderance of the evidence." *Ornelas v. United States,* —— U.S. ——, ——, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996) (quoting *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983)). The fact that certain individuals are required by state law to file reports of suspected abuse makes any other governing standard unworkable, since the statutory mandate of required reporting itself will inevitably result in some—if not many—erroneous reports.

In connection with their argument that errors in reporting render the reports unreliable, plaintiffs have also submitted copies of state DSS reports critical of CWA. *See* Pls.' Mot., Ex. A and B. Exhibit A consists of two state DSS reports from 1991 and 1995: "1991 Monitoring and Analysis Profiles with Selected Trend Data: 1987–1991," and "1995 Monitoring and Analysis Profiles with Selected Trend Data: 1991–1995." These reports provide statistical information on "Child Protective Services" and suggest that many of the cases reported are determined to be unfounded. Exhibit B is another state DSS report, "Review of Investigations, Assessments and Decision Making in Child Abuse and Maltreatment Reports Received by the Child Welfare Administration of New York City," (April 1996) ("CWA Report"). As with the reports found in Exhibit A, it provides statistics that illustrate plaintiffs' contentions that there are significant errors in the abuse reports. However, it also offers a detailed critique of CWA practices and procedures in investigating child abuse cases. Its primary focus is on ensuring a thorough investigation:

---

**16.** Candidly, I find the plaintiffs' reliance on criminal procedure law not only misplaced but surprising. Criminal arrests have been sustained on far less reliable information. The sources of the information are often persons with less than

desirable histories and with possible personal agendas. Here CWA's source was an identified individual with expertise in the relevant field and with no apparent personal agenda.

"Reports of child abuse and maltreatment, like fire alarms, require a prompt and thorough response. The danger to children is potentially so great—and the result of an inadequate response potentially so tragic—that every report, even the equivalent of false alarms, must be taken seriously." CWA Report at 1.

Although plaintiffs submitted these reports for the purpose of illustrating the frequency of error in the reporting system, the CWA review report actually suggests that CWA's investigation in this case was proper. Thus, it is noteworthy that the investigation conducted by Mr. Damas, under the supervision of Mr. Elmore, did not present the violations of the "strict protocols ... for the investigation and assessment of reports of child abuse or maltreatment," documented in the CWA Report at 1. Among other things, these protocols require: initial contact within twenty-four hours of receipt of the initial report; similar responses to subsequent reports; "supervisory participation at key decision points;" adequate documentation of case actions; "reviewing any records of prior abuse or maltreatment; obtaining information from appropriate sources, including the reporting source; contacting ... the alleged perpetrators; and, a home visit." CWA Report at 6–8.

Here, in contrast to the claimed failings noted in the CWA Report, CWA established contact with the family within twenty-four hours of the report of abuse; there was extensive supervisory involvement in decisions; there was contact with Mr. and Mrs. Dietz, and Mr. and Mrs. Salmo; and there was a visit to the Salmo home. The abuse registry was checked for prior incidents by the Dietzes and the Salmos. Mr. Damas, Mr. Elmore and Zone Director Fenton had contact with collateral sources including the hospital social worker, Dr. Giridharan, Det.

Diggs, Mrs. McGurn and Dr. McHugh. All of these contacts were well-documented in Mr. Damas's and Mr. Elmore's case notes. CWA responded as quickly to the second report from the hospital social worker when James was readmitted to the hospital as it had to the initial report. Finally, CWA employed an alternative placement with the Salmos rather than foster care.

It is indeed possible that CWA's performance has been deficient in many cases, as plaintiffs claim and as the reports that they submitted document. It may well be that most of the abuse reports filed with the State Child Abuse Central Register are determined, after investigation, to have no substantial evidence to support them, as the reports in Exhibit A indicate.[17] Plaintiffs point out that in *Valmonte v. Bane*, 18 F.3d 992, 1004 (2d Cir.1994), the Second Circuit found that the state's Central Register contained an "unacceptably high risk of error" that infringed upon a plaintiff's right to employment. Pls.' Reply Br. at 6. However, *Valmonte* is not applicable here, both on the law and the facts.

In *Valmonte,* an individual who sought employment in the child care field argued that her liberty interest in employment was infringed upon because the presence of her name in the Central Register would effectively bar her from obtaining employment. Under the state system, all employers in the child care field were required to consult the Register, and if they wished to hire a listed individual, had to make a written statement justifying their act. See *Valmonte,* 18 F.3d at 995–96. A person could be listed in the Register after the local DSS found that there was "some credible evidence" to support the complaint. *Id.* at 995. Persons seeking removal could contest their inclusion at a predeprivation hearing, where the local DSS

17. It is not clear that these errors are only borne by families whose children are erroneously removed by the state. Plaintiffs note that the report found that up to 21% of the "indicated closed cases" had had an erroneous determination. See Pls.' Mot. ¶ 21; CWA Report at 27. CWA is required to determine whether an abuse report is "indicated" or "unfounded." A report is "indicated" when "some credible existence exists" and "unfounded" when "no credible exis-tence exists." CWA Report at 27. The report found that up to 44% of the "unfounded" cases and 12% of the "open" cases had erroneous determinations. See *id.* at 27. Although this statistic does not rebut plaintiffs' assertion, it does suggest that error occurs across the reporting spectrum. The report notes that "[a] disquieting number of cases were deemed unfounded without adequate or sufficient investigation." *Id.* at 3.

again had only to show that there was "some credible evidence." *Id.* Persons denied employment because of their inclusion in the Register also had the right to a post deprivation hearing at which the state had the burden of proving the allegations by a "fair preponderance of the evidence." *Id.* After noting that 75% of those who sought to have their name expunged from the Register were successful, the Second Circuit held that the risk of erroneous deprivation was so great as to deprive Valmonte of her liberty interest in employment in the child care field. *See id.* at 1002–04.

*Valmonte* is not relevant in this context. The purpose of requiring certain health care workers to make reports of suspected abuse, and setting the standard for inclusion as "some credible evidence" is to effectively further the state's "strong interest" in protecting children from immediate harm. *See Valmonte,* 18 F.3d at 1003. It cannot ensure accuracy. Like warrantless arrests, which may be made on probable cause in exigent circumstances (and often turn out to be erroneous) child abuse investigations require a functional, reasonable balance between competing concerns.[18] The state's interest in the well being of children justifies only an objectively reasonable, temporary removal, not a permanent removal. *Valmonte* indicates that this justification cannot be extended to effect a permanent denial of the right to employment in the child care field without any consideration of the accuracy of the fact finding process.

The New York Court of Appeals recently illustrated the fact that functional considerations determine the appropriate degree of accuracy required at each stage in the abuse reporting system. In *Lee TT. v. Dowling,* 87 N.Y.2d 699, 642 N.Y.S.2d 181, 664 N.E.2d 1243 (N.Y.1996), the court, following *Valmonte,* held that due process required that a report of child abuse must be substantiated by a "fair preponderance of the evidence" before being released "as a screening device for future employment." *Id.* at 712, 642

N.Y.S.2d 181, 664 N.E.2d 1243. Significantly, the court also held that "[d]uring the investigative process the information may be retained on the strength of some credible evidence supporting it and released to ... health care and law enforcement agencies under the terms and conditions listed in [N.Y. Social Services Law § ] 422(4)(A)." *Id.* Thus, where the investigation is at an early stage, and the deprivation is a temporary one pending an adversarial hearing, it is not improper for the defendants to rely on a report that contains some credible evidence. Thus, plaintiffs's statistical argument about error rates is irrelevant to this case.

In any event, plaintiffs' argument that a report of abuse is not always reliable is not relevant where, as here, a health care professional files an undisputed report of severe injury to a child. This alone would constitute probable cause—as would the statement of an identified witness to an armed robbery. Moreover, CWA action was not taken solely on the basis of the report of abuse: critically, the severity of James's actual injuries was confirmed in discussions with Dr. Grillo and the Dietzes themselves. Finally, the report's errors were identified through discussion with the Dietzes. There is no dispute that James Dietz was severely injured as the result of child abuse. Nor is there any dispute that the report identifying his parents as possible abusers was filed at the direction of Dr. Giridharan. Plaintiffs do not dispute that Dr. Giridharan refused to narrow the time frame in a way that would eliminate them from suspicion when questioned by the police detective and the CWA caseworker who were investigating the report. As noted in the opinion, the injury Dr. Giridharan reported is considered prima facie evidence of abuse under New York law. *See* 932 F.Supp. at 447. CWA's actions with respect to the Dietzes were objectively reasonable. The petition that CWA filed in Family Court was based on probable cause and did not violate plaintiffs' constitutional rights.[19] The delay in providing an adver-

---

**18.** Probable cause is a "practical compromise" that allows officials to take prompt steps to temporarily detain a suspect or remove a child.

*Gerstein v. Pugh,* 420 U.S. 103, 113, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975).

**19.** As the opinion points out, 932 F.Supp. at 460, under our federal system, New York State is, of

sarial hearing was justified and thus did not violate constitutional due process standards. Plaintiffs lack standing to sue for harms CWA may have done to others. *See Allen v. Wright,* 468 U.S. 737, 760–61, 104 S.Ct. 3315, 3329–30, 82 L.Ed.2d 556 (1984).

Whether or not the delay was a violation of state law is an open question of state law that this court has declined to consider. Plaintiffs have failed to raise any but conclusory allegations that the repetition of the errors from the initial abuse report in the petition resulted from malice rather than inadvertence when a substitute caseworker was used in Mr. Damas' absence.

### 3. Other Legal Arguments Raised in Plaintiffs' Reply Brief

■ Plaintiffs take issue, *see* Pls.' Reply Br. at 15–16, with the opinion's analysis of *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), noting that it was limited by the Supreme Court to state prison regulations. *See* 932 F.Supp. at 453. Plaintiffs choose to ignore that the discussion responded to their attempt to extend pre-*Sandin* decisions, also based on state prison regulations, such as *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) and *Wright v. Smith,* 21 F.3d 496 (2d Cir. 1994), to establish the existence of liberty interests cognizable under 42 U.S.C. § 1983 that derive from state law rather than directly from the United States Constitution. Plaintiffs instead assert that the liberty interest they advocate is "living together as a family." Pls.' Reply Br. at 16. However, plaintiffs offer no reason that the *Sandin* limitation does not apply to their effort to extend the same rationale. In fact, *Sandin* is quite relevant, as it makes the extension of law for which plaintiffs have argued even less

compelling. *Sandin* also undercuts plaintiffs' efforts to establish a 42 U.S.C. § 1983 violation flowing from an alleged violation of New York State law and regulation.

However, assuming (without deciding) that *Sandin* is not applicable, plaintiffs' argument must also fail.[20] If *Sandin* is not applicable, then plaintiffs' claim is analyzed under *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). *See Watson v. City of New York,* 92 F.3d 31, 37 (2d Cir.1996) (discussing *Hewitt* analysis in light of *Sandin* ). Under *Hewitt,* the relevant inquiry is whether the state established an interest through "the repeated use of explicitly mandatory language." *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871. While the language in § 1026 of the Family Court Act is mandatory in that it requires a hearing to be held, plaintiffs have not shown that the delay in this case falls outside the latitude the statute grants. As noted in the opinion, there was no constitutional violation here.[21] *See* 932 F.Supp. at 448–52.

Although the precise nature of the liberty interest plaintiffs assert ("living together as a family") is unclear, in part because they do not cite any cases, it is possible that plaintiffs are suggesting that state law might implicate substantive due process concerns. "[L]iving together as a family" suggests such an interest, and the cases plaintiffs earlier relied upon, such as *Vitek,* actually construe substantive liberty interests that exist "irrespective of state regulation." *Sandin v. Conner,* —— U.S. ——, —— – —— n. 4, 115 S.Ct. 2293, 2297–98 n. 4, 132 L.Ed.2d 418 (1995). "The substantive component of the due process clause 'bar[s] certain government actions regardless of the fairness of the procedures used to implement them … [and thereby] serves to prevent governmental

course, free to require a greater showing than that made here before CWA can intervene in this type of situation. This would certainly reduce the risk of erroneous interference in parental rights, but such a higher standard may, as a practical matter, leave the State unable to act effectively to deal with parental child abuse. The Constitution does not require such a showing before the State can intervene. *See* 932 F.Supp. at 453 (providing a hearing after emergency removal of child and subsequent justifiable delay is not a denial of due process).

**20.** The Fourth Circuit has suggested that *Sandin* does not apply outside of the prisoner context. *See Mallette v. Arlington County Employees' Supplemental Retirement System II,* 91 F.3d 630, 636 n. 3 (4th Cir.1996).

**21.** Inasmuch as the opinion thoroughly discussed the nature of the procedural due process claim, that claim need not be revisited here.

power from being 'used for purposes of oppression.' " *Callahan v. Lancaster–Lebanon Intermediate Unit 13,* 880 F.Supp. 319, 328 (E.D.Pa.1994) (quoting *Daniels v. Williams,* 474 U.S. 327, 331–32, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (internal citations omitted)). There is no question that the liberty interest plaintiffs assert is one that has repeatedly been affirmed by the Supreme Court, but it is not without limits. *See Lehr v. Robertson,* 463 U.S. 248, 256–58, 103 S.Ct. 2985, 2990–92, 77 L.Ed.2d 614 (1983) (affording constitutional protection to parent-child relationship in "appropriate cases"); *Hodge v. Jones,* 31 F.3d 157, 163–64 (4th Cir.1994) ("The maxim of familial privacy is neither absolute nor unqualified, and may be outweighed by a legitimate governmental interest.") (citations omitted) (holding that state's maintenance of "unsubstantiated" abuse report did not violate family liberty interest), *cert. denied,* —— U.S. ——, 115 S.Ct. 581, 130 L.Ed.2d 496 (1994); *Watterson v. Page,* 987 F.2d 1, 8 (1st Cir.1993) ("The right to family integrity clearly does not include a constitutional right to be free from child abuse investigations."); *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (infringing on parental child custody liberty interest is permissible in emergency circumstances); cf. *Marisol A. v. Giuliani,* 929 F.Supp. 662, 676–77 (S.D.N.Y.1996) (finding no substantive due process claim for right to associate with family members, regardless of statutory mandate).[22] Here, plaintiffs assert this liberty interest in an abstract fashion by stating it as an interest in "living together as a family." However, precisely because the dimensions of this abstract interest are unclear, the Supreme Court has required that a plaintiff alleging the infringement of an abstract liberty interest must do so with particularity. " '[I]f the test of 'clearly established law' were to be applied at this [abstract] level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of [*Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ].' " *Frazier v. Bailey,* 957 F.2d 920, 930 (1st Cir.1992) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034,

3039, 97 L.Ed.2d 523 (1987)). As the Fourth Circuit noted,

> To expect Defendants to resolve what reasonable jurists have long debated—namely the precise strictures of the penumbral right to familial privacy, cast in the sweeping language of the Supreme Court cases ... especially in the face of a legitimate state interest such as the effective detection and prevention of child abuse—is to impose burdens and expectations well beyond their reasonable capacities.

*Hodge,* 31 F.3d at 167 (footnote and citation omitted).

The Second Circuit has repeatedly stated that defendants "enjoy qualified immunity from liability for damages if at the time of the pertinent episode it was not clear that the actions they took violated established constitutional rights, or if it was objectively reasonable for them to believe that their actions did not violate such rights as were then clearly established." *van Emrik v. Chemung County,* 911 F.2d 863, 865–66 (2d Cir. 1990) (citing *Robison v. Via,* 821 F.2d 913, 920–21 (2d Cir.1987)). Here, plaintiffs have not shown that the acts by defendants clearly infringed on the "nebulous right of family integrity." *Hodorowski v. Ray,* 844 F.2d 1210, 1217 (5th Cir.1988) (rejecting argument that temporary removal of children from parents' home without a court order violates family liberty interest). As a result, plaintiffs' infringement argument is unavailing.

Plaintiffs next argue that there was no probable cause to continue the proceeding against the Dietzes after March 7, 1989, when Dr. Giridharan refined her time frame for James's abuse to exclude them. Plaintiffs' reliance on *Posr v. Doherty,* 944 F.2d 91 (2d Cir.1991) to revive their claim for malicious prosecution is misplaced. In *Posr* the Second Circuit stated:

> In order to prove either a § 1983 or state law claim of malicious prosecution, plaintiff must establish that (1) the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that

---

**22.** *Valmonte* is not to the contrary. There, the court declined to find that child rearing interests

were implicated. *See Valmonte v. Bane,* 18 F.3d 992, 1003 (2d Cir.1994).

there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted with actual malice.

*Id.* at 100. In *Posr,* the court held that probable cause with respect to one charge did not establish that there could be no malicious prosecution with respect to other charges. The court noted that the issue was whether probable cause existed for each charge, not whether the charge was terminated in the plaintiff's favor. *See id.* Here, where there was probable cause for the only charge that was brought against the Dietzes, the specific *Posr* holding seems inapplicable. Nor have plaintiffs cited any other cases to support their argument that continuous probable cause is required. Further, Family Court, and not CWA, determined the level of supervision over the Dietzes after January 3, 1989. Thus no revision of the previous analysis of plaintiffs' malicious prosecution claim is warranted.

■ Finally, plaintiffs argue that their First Amendment claims were incorrectly dismissed. In doing so, plaintiffs first misstate the holding of the opinion with respect to their First Amendment claim and then incorrectly apply *Johnson v. Bax,* 63 F.3d 154 (2d Cir.1995) to their claim. First, the opinion applied the analysis to plaintiffs' retaliatory prosecution claim that is applicable when, as here, probable cause exists for a prosecution. *See* 932 F.Supp. at 458. When probable cause exists, plaintiffs must show that the prosecution actually chilled their First Amendment rights. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 120 (2d Cir.1995) (holding that conclusory allegations of retaliatory prosecution are insufficient to support a First Amendment claim), *cert. denied,* —— U.S. ——, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996). Here plaintiffs failed even to allege that the retaliation effectively chilled their exercise of their First Amendment rights, thus not even coming close to meeting their burden.[23]

Second, *Johnson* is concerned with "independent" First Amendment claims. In *John-*son, the plaintiff sought damages for First Amendment violations that were independent of the resolution of the charge against him. *See Johnson,* 63 F.3d at 157. Here, the resolution of plaintiffs' claims are inextricably intertwined with the determination of the reasonableness of CWA's actions, because their First Amendment activity was prompted by the agency's investigation, and, in fact, was a response to it. In *Johnson,* the plaintiff was prevented from exercising his First Amendment rights prior to any effort to prosecute him, while here plaintiffs have not shown that their claim is independent.

■ Assuming, however, that plaintiffs' claim is independent, it still must fall. A retaliation claim requires an analysis of the actor's subjective intent as well as an examination of the objective reasonableness of that actor's conduct. *See Blue v. Koren,* 72 F.3d 1075, 1082 (2d Cir.1995). The Second Circuit has indicated that in this context, a plaintiff alleging retaliation "must offer specific evidence of improper motivation." *Id.* at 1083.

> Upon a motion for summary judgment asserting a qualified immunity defense in an action in which an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must proffer particularized evidence of direct or circumstantial facts ... supporting the claim of an improper motive in order to avoid summary judgment.

*Sheppard v. Beerman,* 94 F.3d 823, 828 (2d Cir.1996) (quoting *Blue,* 72 F.3d at 1084). In *Blue,* the Second Circuit suggested that such evidence of improper motive can include "expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Blue,* 72 F.3d at 1084. Here, rather than provide evidence to support their claims, plaintiffs have offered only conclusory allegations to suggest improper motive. Nor is there any evidence in the record to support their argument. As the *Blue* court indicated, while the sequence of events might be suggestive to the ag-

---

23. The opinion accepted, for purposes of the summary judgment motion, the inference that the Family Court petition was filed in retaliation for the political pressure brought to bear upon CWA staff on behalf of the Dietzes.

grieved party, mere temporal proximity of events does not satisfy this standard. *See id.* at 1085. There is no evidence that plaintiffs were singled out, or that the actions taken were unusual or in contrast to other cases, or that CWA did not follow prescribed procedures.

### Conclusion

For the foregoing reasons, the Court adheres to its previous grant of summary judgment to the City defendants.

SO ORDERED.